2006-NMSC-005

129 P.3d 142

**STATE of New Mexico, Plaintiff–Respondent,**

v.

**Israel Delgado MUNOZ, Defendant–Petitioner.**

No. 27,945.

Supreme Court of New Mexico.

Jan. 31, 2006.

John A. McCall, Albuquerque, NM, for Petitioner.

Patricia A. Madrid, Attorney General, Ann M. Harvey, Assistant Attorney General, Santa Fe, NM, for Respondent.

## OPINION

MAES, Justice.

{1} Defendant Israel Delgado Munoz ("Defendant") was convicted of custodial interference, contrary to NMSA 1978, § 30–4–4(B) (1989), and injuring or tampering with a vehicle, contrary to NMSA 1978, § 66–3–506 (1978). The Court of Appeals affirmed Defendant's convictions in an unpublished memorandum opinion. *State v. Munoz*, No. 23,-094 (Ct.App. Feb. 7, 2003). This Court granted Defendant's petition for a writ of certiorari pursuant to Rule 12–502 NMRA 2006. On certiorari review, we consider two issues related to Defendant's conviction for custodial interference: (1) whether the instruction given to the jury defining *good cause* constituted error because it failed to include the concept of *good faith;* and (2) whether the trial court erred in refusing to give the jury Defendant's tendered instruction defining *protracted period of time.* We hold that the trial court's *good cause* instruction did not adequately reflect New Mexico's custodial interference law; however, we find the erroneous definitional instruction did not amount to reversible error. We also hold that the trial court's refusal to give Defendant's requested instruction defining *protracted period of time* was not erroneous because the meaning of the phrase is readily understandable. Accordingly, we affirm Defendant's conviction for custodial interference.

## FACTS AND PROCEEDINGS BELOW

{2} The following facts were adduced at Defendant's criminal trial. In 1996, Defendant and his wife, Yolanda Munoz ("Yolanda"), divorced in order to protect several of their business enterprises, which were jeopardized by Defendant's prior felony conviction. Yolanda testified further that she also went along with the divorce because she was unhappy with the marriage. In the divorce decree, Defendant and Yolanda were given joint legal custody of their four children, with Yolanda receiving physical custody of the children and Defendant receiving liberal visitation rights. However, the two continued to live together until 1999, when Yolanda and the children moved to Carlsbad, New Mexico.

After Yolanda moved to Carlsbad, Defendant and Yolanda no longer acted as a married couple. Defendant lived in another city and would occasionally visit the children. Sometimes Defendant would ask Yolanda if they could get back together. Defendant wanted the family to move to Arizona. Yolanda, however, did not want to reunite with Defendant.

{3} In July 2000, Defendant went to Yolanda's house to visit. At that time, Defendant was living with his brother in Safford, Arizona. Defendant stayed at the house, ignoring Yolanda's repeated requests to leave. On July 3, Yolanda called Defendant from work and told him to leave her home. Despite this request, Defendant was there when Yolanda came home from work. In order to avoid arguing with Defendant, Yolanda left the house for the evening, leaving the children in Defendant's care.

{4} In the early morning hours of July 4, 2000, Yolanda had not returned home and Defendant left the house to look for her. Defendant observed Yolanda with a male acquaintance. Upon seeing Yolanda with another man, Defendant returned home, woke up his three youngest children and took them to see what their mother was doing. Around dawn, Yolanda attempted to approach her car, however, as she approached she saw Defendant waiting for her in the car. Defendant ran out of the car and chased Yolanda, who fled with her male acquaintance. Defendant and the three children then drove Yolanda's vehicle back to her home.

{5} When Defendant and the three youngest children returned from observing Yolanda, Defendant proceeded to pack up his things. He also packed clothing and toys belonging to the three youngest children. Defendant removed the distributor wire from Yolanda's vehicle, disabling it so that she could not follow him. He then took the three youngest children to Arizona.

{6} When Yolanda finally returned to her home, she saw her oldest child standing outside on the road. Upon hearing that Defendant had left with the three other children, Yolanda went to the police station to report the incident. Yolanda returned home to find the contents of her purse strewn about the grass and her car parked in an unusual place behind the home. She could not start her car because of the missing distributor wire. When Defendant took the three youngest children, he also took some of Yolanda's personal items, including her money.

{7} Defendant and the children called Yolanda after arriving in Arizona and stayed in almost daily contact while they were away. Each time Yolanda spoke to Defendant, she demanded that he return the children, but Defendant said he would not return the children until she moved to Arizona. At one point Defendant offered to meet Yolanda in El Paso, Texas with the children, on the condition that she go alone. Yolanda declined Defendant's offer because she was unwilling to go by herself. The children were eventually returned to Yolanda sixteen days after they were taken, following Defendant's arrest at a social services agency in Arizona on July 19, 2000.

{8} As a result of these events, Defendant was charged with custodial interference, contrary to Section 30-4-4(B), injuring or tampering with a vehicle, contrary to Section 66–3–506, unlawful taking of a motor vehicle, contrary to NMSA 1978, § 66-3-504 (1998), and larceny, contrary to NMSA 1978, § 30–16–1 (1987). During Defendant's trial, two definitional jury instructions related to custodial interference became an issue. The jury was given the following instruction outlining the elements of custodial interference:

> For you to find the defendant guilty of Custodial Interference ... the State must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:
>
> 1. The defendant had a right to custody of [the children];
>
> 2. The defendant maliciously took [the children], *and* failed to return them without *good cause;*
>
> 3. At the time defendant took [the children], each of them was under the age of eighteen (18);
>
> 4. The defendant intended to deprive permanently or for a *protracted period of time* another person also having a right to custody of these children....

(Emphasis added.) Neither party objected to this instruction outlining the elements of custodial interference. However, Defendant and the State disagreed about related instructions defining the terms *good cause* and *protracted period of time*.

{9} Both Defendant and the State tendered definitional jury instructions for the term *good cause*. Defendant's proposed definition for *good cause* was taken from *State v. Luckie*, which defined *good cause* as " 'a good faith and reasonable belief that the taking, detaining, concealing, or enticing away of the child is necessary to protect the child from immediate bodily injury or emotional harm.' " 120 N.M. 274, 278, 901 P.2d 205, 209 (Ct.App.1995) (*quoting* CAL.PENAL CODE § 277 (Cum.Supp.1995)). The State's submitted definition was also taken from *Luckie*, but based on employment law, and stated that " '[g]ood cause is established when an individual faces compelling and necessitous circumstances of such magnitude that there is no [other] alternative.' " *Id.* at 277–78, 901 P.2d at 208–09 (*quoting Molenda v. Thomsen*, 108 N.M. 380, 381, 772 P.2d 1303, 1304 (1989)). After argument by counsel, the trial court chose the State's instruction based on the Court of Appeal's statement in *Luckie* that the employment law definition "can readily be applied to varying fact patterns in the context of our custodial interference statute." *Id.* at 278, 901 P.2d at 209. The trial court interpreted the appellate court's comment as instructing lower courts to use the employment law definition in custodial interference cases. Consequently, the jury was given the employment context instruction over Defendant's alternative request that no instruction be given.

{10} The trial court declined Defendant's request to provide the jury with a definitional instruction for the phrase *protracted period of time*. The court determined that the phrase was readily understandable and an instruction would not aid the jury.

{11} The jury convicted Defendant of custodial interference and injuring or tampering with a motor vehicle and acquitted him of unlawful taking of a motor vehicle and larceny. The Court of Appeals held that the jury instruction given adequately defined *good*

*cause* and that it was not necessary to define *protracted period of time* for the jury. We granted certiorari to review the *good cause* definitional instruction and the trial court's decision not to instruct the jury on the definition of *protracted period of time*.

## DISCUSSION

### *Good Cause* Instruction

■ {12} "The standard of review we apply to [the *good cause* instruction] depends on whether the issue has been preserved." *State v. Benally*, 2001–NMSC–033, ¶ 12, 131 N.M. 258, 34 P.3d 1134. If Defendant preserved the error, we review the given instructions under a reversible error standard. *Id.* If Defendant failed to preserve the issue for review, we review for fundamental error. *Id.* Thus, we must first address the State's claim that the *good cause* instruction should be reviewed only for fundamental error.

■ {13} The State maintains that the jury instruction error now identified by Defendant was not preserved because after the State submitted the instruction drawn from *Molenda*, the defense maintained a general objection to the instruction but did not point to any fault in the instruction's failure to expressly address *good faith*. Defendant, however, took two significant steps which constituted adequate preservation. First, Defendant submitted the *good cause* definition found in the California custodial interference statute cited in *Luckie* that specifically states *good faith* is an element of *good cause*. Second, when Defendant's tendered instruction was refused, Defendant objected and argued alternatively that no instruction defining *good cause* should be given. By taking these two steps, Defendant fairly invoked a ruling by the trial court. *Benally*, 2001–NMSC–033, ¶ 26, 131 N.M. 258, 34 P.3d 1134 (Baca J., dissenting) ("With respect to jury instructions, a ruling or decision by the district court may be fairly invoked by either a formal objection to the instruction that is to be given to the jury by the court, or by tendering a correct instruction."). Therefore, we review the given instruction for reversible error.

{14} In order to determine whether the *good cause* instruction given to the jury con-

stitutes reversible error, it is first necessary to clarify both types of action prohibited by the custodial interference statute and the mental state a defendant must have to be subject to conviction for custodial interference. The custodial interference statute states:

> Custodial interference consists of any person, having a right to custody of a child, maliciously taking, detaining, concealing or enticing away *or* failing to return that child without good cause and with the intent to deprive permanently or for a protracted time another person also having a right to custody of that child of his right to custody. Whoever commits custodial interference is guilty of a fourth degree felony.

Section 30–4–4(B) (emphasis added). The statute clearly sets forth two distinct ways that a person, having a right to custody of a child, can commit custodial interference: (1) maliciously taking, detaining, concealing or enticing away a child with the intent to deprive permanently or for a protracted period of time another person also having a right to custody; or (2) failing to return that child without good cause and with the intent to deprive permanently or for a protracted time another person also having a right to custody of that child of his right to custody. The first act constitutes "taking" interference, and the second, "failing to return" interference. To be guilty of custodial interference, a defendant need only engage in one of the acts prohibited by the statute, either "taking" interference or "failing to return" interference.

■ {15} Both types of custodial interference require malice and the intent to deprive permanently or for a protracted time another person of his or her custodial rights. *Luckie,* 120 N.M. at 278, 901 P.2d at 209 ("[W]e think it is clear that the term *'maliciously'* modifies all of the proscribed conduct in Section 30–4–4(B), and is an essential element of the alleged offense."). Only the second type, "failing to return" interference, requires a showing that a defendant acted without *good cause.* Thus, the *good cause* instruction in this case only pertains to the jury's finding with regard to "failing to return" interference. Having clarified the type of harm that

is prohibited by the custodial interference statute and a defendant's requisite mental state, we now turn to the meaning of *good cause* in custodial interference cases in New Mexico. Defendant argues that a *good cause* instruction in custodial interference cases should include the concept of *good faith.* We agree.

■ {16} Currently there is no uniform jury instruction defining *good cause* and no New Mexico case has defined *good cause* within the context of custodial interference. *Cf. Luckie,* 120 N.M. 274, 901 P.2d 205 (discussion of *good cause* limited to determining whether the term rendered our custodial interference statute unconstitutionally vague). Therefore, to determine what constitutes *good cause* in custodial interference cases, we must consider the objective of the custodial interference statute. The custodial interference statute is intended to prevent persons with custodial rights from disrupting another person's right to custody. Section 30–4–4(B). However, recognizing that there may be situations in which custodial interference is warranted, the legislature modified the custodial interference statute to include the requirement that the custodial interference must be perpetrated "without good cause." *Compare* NMSA 1978, § 30–4–4 (prior to 1989 amendments), *with* NMSA 1978, § 30–4–4(B) (1989). Thus the statute punishes conduct effected without *good cause* and excuses conduct justified by *good cause.*

{17} The Model Penal Code offers guidance as to what constitutes *good cause* in custodial interference cases. In the section on interference with custody, the Model Penal Code provides an affirmative defense when "the actor believed that his action was necessary to preserve the child from danger to its welfare." MODEL PENAL CODE § 212.4(1)(a) (Official Draft and Revised Comments 1962). To prevent the willful defiance of a custody order, however, the Model Penal Code requires a defendant's belief to be a *good faith* belief. *Id.* at § 212.4 cmt. 3 (the Model Penal Code requires "an honest belief that the actor's conduct was 'necessary to preserve the child from danger to its welfare.' "). Several other jurisdictions also excuse a defendant's conduct when his or her

action is taken to protect a child from harm, so long as the action is based on a *good faith* belief, a reasonable belief, or both.[1]

{18} We believe that the term *good cause* in our custodial interference statute similarly encompasses the concepts of subjective *good faith* and objective reasonableness. To avoid criminal sanctions for custodial interference, a defendant must have an honest belief that his actions are necessary to protect a child from harm and that honest belief must be reasonable. A defendant's unreasonable belief that custodial interference is necessary to protect children from harm will not satisfy the *good cause* requirement.

{19} In custodial interference cases, an instruction defining *good cause* should communicate that a defendant's belief must be both reasonable and in *good faith*. Therefore, when a defendant requests an instruction defining *good cause, good cause* should be defined. A suggested definition is as follows: "a good faith and reasonable belief that the defendant's actions were necessary to protect a child from physical or significant emotional harm."[2] We believe this suggested definition adequately describes our state's custodial interference law which excuses a defendant's actions when they are motivated by an honest and reasonable belief that custodial interference is necessary to prevent physical harm or significant emotional harm. Our uniform jury instructions committee should review this instruction and make a further recommendation.

{20} We acknowledge that the *good cause* instruction given to the jury in this case did not accurately reflect New Mexico's custodial interference law because it failed to address the concept of *good faith*. When reviewing an erroneous jury instruction for reversible error, "[w]e consider jury instructions as a whole, not singly," *State v. Montoya*, 2003–NMSC–004, ¶ 23, 133 N.M. 84, 61 P.3d 793, and we look to see "whether a reasonable juror would have been confused or misdirected by the jury instructions." *Id.*

{21} When the given jury instructions are examined as a whole, it becomes clear that the jury in this case could not have been confused or misdirected by the erroneous *good cause* instruction. The jury was instructed that to find the defendant guilty of custodial interference, "[t]he State must prove to your satisfaction beyond a reasonable doubt that ... the defendant maliciously took [the children], *and* failed to return them without good cause." (Emphasis added.) As previously discussed, either "taking" interference or "failing to return" interference alone constitutes illegal custodial interference, however, the instruction in this case required the jury to find beyond a reasonable doubt that Defendant both maliciously took the children *and* failed to return them without *good cause*. In light of this instruction, Defendant's conviction for custodial interference meant that the jury found Defendant guilty

---

1. The Model Penal Code and most of the jurisdictions that provide a defense for actions taken to protect a child from harm limit the defense to actions based on a good faith belief, a reasonable belief, or both. *See, e.g.,* Ariz.Rev.Stat. § 13–1302(C)(2)(a) (2001) (requiring a good faith and reasonable belief); Cal.Penal Code § 278.7(a) (1999) (requiring a good faith and reasonable belief); Colo.Rev.Stat. § 18–3–304(3) (2005) (requiring a reasonable belief); Fla. Stat. § 787.03(4) (2005) (requiring a reasonable belief); Haw.Rev.Stat. § 707–726(2) (1993) (requiring a good faith and reasonable belief); La.Rev. Stat. Ann. § 14:45.1(A) (1997) (requiring a reasonable belief); Minn.Stat. § 609.26(2)(1) (2004) (requiring a reasonable belief); N.J. Stat Ann. § 2C:13–4(c)(1) (2005) (requiring a reasonable belief); Ohio Rev.Code Ann. § 2919.23(c) (1997) (requiring a good faith and reasonable belief); Vt. Stat. Ann tit. 13, § 2451 (1998) (requiring a good faith belief); Wash Rev.Code § 9A.40.080(2)(a) (2004) (requiring a reasonable belief); W. Va.Code § 61–2–14(d)(c) (2005) (requiring a reasonable belief); Wis. Stat. § 948.31(4)(a)(1) (2005) (requiring a reasonable belief); *see also* N.H. Rev. Stat. Ann. § 633:4(III) (1996) (requiring a good faith act).

2. This suggested definition takes into account California's custodial interference statute, Cal.Penal Code § 277 (Cum.Supp.1995), on which the Court of Appeals apparently relied in *State v. Luckie*, 120 N.M. 274, 901 P.2d 205 (Ct.App. 1995), and the version of the California statute in effect at the time of Defendant's conduct, Cal.Penal Code § 278.7(a) (1999). Our suggested instruction identifies the types of harm that are relevant in New Mexico. We believe that a defendant should be permitted to protect a child from both physical harm and significant emotional harm without being subjected to criminal penalty.

of both "taking" interference and "failure to return" interference.

{22} The erroneous *good cause* instruction only affected "failure to return" interference because *good cause* only modifies "failure to return" interference. Section 30–4–4(B) ("failing to return that child without good cause"). Thus, the incorrect definitional instruction had no bearing on the jury's finding that Defendant engaged in "taking" interference. Because the jury found Defendant guilty of "taking" interference, an error with regard to "failure to return" interference should not invalidate the jury's verdict that Defendant was guilty of custodial interference based on "taking" interference. Therefore, when the jury instructions are considered as a whole, the jury was not confused or misled as to "taking" interference and the *good cause* instruction error did not amount to reversible error.

### *Protracted Period of Time* Instruction

{23} Defendant contends that the trial court erred when it refused to give the jury his tendered instruction defining the phrase *protracted period of time.* Defendant's proposed instruction read: "protracted period of time means a lengthy or unusually long time under the circumstances." Relying on *State v. Mascareñas*, 2000–NMSC–017, 129 N.M. 230, 4 P.3d 1221, Defendant asserts that the trial court was required to give his tendered instruction. Defendant appears to argue that once a court has determined the meaning of a term, the jury should be instructed on that meaning. However, Defendant told the trial court when he submitted his definitional instruction that the definition might be helpful to the jury but that it was not required. Defendant asserts that because it is uncertain whether the jury considered the circumstances in determining whether he had kept the children for a *protracted period of time,* this error rose to the level of fundamental error.

{24} We conclude that the trial court did not err in refusing to give Defendant's requested instruction. "Where the issue is the failure to instruct on a term or word having a common meaning, there is no error in refusing an instruction defining the word or term." *State v. Carnes*, 97 N.M. 76, 79, 636 P.2d 895, 898 (Ct.App.1981). Since the phrase *protracted period of time* is self-explanatory and has an understandable and common meaning, there was no need for further definition. *See Trujeque v. Serv. Merch. Co.*, 117 N.M. 388, 390, 872 P.2d 361, 363 (1994) (concluding that the phrase "exclusive control and management" was self-explanatory and thus required no further definition for the jury); *Luckie*, 120 N.M. at 279, 901 P.2d at 210 (concluding that the phrase *protracted time* does not require "enactment of a further statutory definition" because "any reasonable person would interpret the meaning of the phrase 'protracted period' to mean a 'lengthy or unusually long time under the circumstances' " (*quoting People v. Obertance*, 105 Misc.2d 558, 432 N.Y.S.2d 475, 476 (1980))). Indeed, Defendant admits that this phrase has a common meaning.

{25} Additionally, Defendant's reliance on *Mascareñas* is misplaced. In *Mascareñas*, 2000–NMSC–017, ¶ 21, 129 N.M. 230, 4 P.3d 1221, we held that the trial court committed fundamental error when it failed to properly instruct the jury on the *mens rea* element of the crime at issue. We determined that "the trial court's failure to provide the instruction was a critical determination akin to a missing elements instruction." *Id.* ¶ 20. That is not the situation here because the jury was properly instructed on all the elements of the crime. Thus, *Mascareñas* is not applicable to the facts of this case.

{26} Further, Defendant was able to argue his interpretation of the meaning of *protracted period of time* to the jury. Defendant argued that he did not intend to keep the children for a *protracted period of time,* unlike situations where a child is taken and never heard from again until several years later when the child is found. Defendant said that he never intended to deprive Yolanda of the children; she knew where they were and he told her that she could come and get them. He argued that the two-week time period in this case did not qualify as a *protracted period of time.* We believe that a reasonable juror could glean from Defendant's closing argument that a *protracted*

*period of time* meant an unusually lengthy amount of time and that, according to Defendant, the two-week period was not unusually long under the circumstances of this case. Thus, we conclude that no error resulted from the trial court's refusal to give the jury Defendant's tendered definitional instruction on the phrase *protracted period of time. Cf. Benally,* 2001–NMSC–033, ¶ 21, 131 N.M. 258, 34 P.3d 1134 (holding that closing argument was not sufficient to correct fundamental error arising from an erroneous jury instruction).

## CONCLUSION

{27} For the reasons stated, we affirm Defendant's conviction for custodial interference.

{28} **IT IS SO ORDERED.**

WE CONCUR: RICHARD C. BOSSON, Chief Justice, PAMELA B. MINZNER, PATRICIO M. SERNA, and EDWARD L. CHÁVEZ, Justices.